**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**24-20078-CR-GAYLES/GOODMAN**
Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 982(a)(7)
18 U.S.C. § 981(a)(1)(C)

**UNITED STATES OF AMERICA**

vs.

**MARCELO KOCHEN,**
**MICHAEL KOCHEN, and**
**SANDRO HEREK,**

**Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided

free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and

disabled. The benefits available under Medicare were governed by federal statutes and regulations.

The United States Department of Health and Human Services ("HHS"), through its agency, the

Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each Medicare beneficiary was given a unique Medicare identification number.

4.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, durable medical equipment ("DME"), and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. Medicare Part C, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations. Medicare Part D covered prescription drugs.

5.      Health care providers, such as DME suppliers, laboratories, and pharmacies, that provided and supplied items and services to Medicare beneficiaries were referred to as "providers." Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6.      When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural

Terminology ("CPT") Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number or Medicare Beneficiary Identifier; (b) the date on which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

7.      Medicare would only pay for items and services that were medically reasonable and necessary, eligible for reimbursement, and provided as represented. Medicare would not pay claims for items and services that were procured through the payment of illegal kickbacks and bribes.

### Medicare Part C – Medicare Advantage

8.      Medicare Advantage, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans ("Medicare Advantage Plans"), rather than through Medicare Parts A and B.

9.      Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Part A and Part B. To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

10.      A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans. These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, and often

3

made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

11.     To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the beneficiary's Medicare Advantage Plan. The claim forms were typically submitted electronically via the internet.

12.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

13.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the health insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a predetermined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments. Beneficiaries with more illnesses or more serious conditions would generally rate a higher capitation payment than healthier beneficiaries.

14.     Medicare Advantage Plans were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

### Durable Medical Equipment

15.     Medicare Part B covered an individual's access to DME. An individual could receive DME through a private managed health care plan enrolled with Medicare Part C, as described above.

16.     Orthotic devices were a type of DME that included off-the-shelf ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). Off-the-shelf braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

17.     A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the DME provided to the beneficiary, the date the DME was provided, the cost of the DME, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

18.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical professional.

### Telemedicine

19.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or a telephone, to interact with a patient. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.

20.     Medicare covered expenses for specific telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

### Relevant Banks

21.     Bank 1 was a financial institution based in San Francisco, California.

22.     Bank 2 was a financial institution based in Charlotte, North Carolina.

### The Defendant and Related Entities

23.     The CLADD Group LLC ("CLADD Group") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

24.     CLADD Health Corp. ("CLADD Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

25.     CLADD Holdings Corp ("CLADD Holdings") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

26.     CLADD Holdings and Consulting LLC ("CLADD Consulting") was a Florida corporation located at 1498 Jefferson Ave., Miami Beach, Florida.

27.     CLADD Healthcare LLC ("CLADD Healthcare") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida. CLADD Healthcare held a corporate bank account ending in 4635 at Bank 1 (the "CLADD Healthcare Account").

28.     CLADD Investment Group LLC ("CLADD Investment") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

29.     CLADD Medical Group LLC ("CLADD Medical") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

30.     CLADD Medical Supply LLC ("CLADD Supply") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

31.     VIP Medical Group LLC ("VIP Medical") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

32.     CLADD Group, CLADD Health, CLADD Holdings, CLADD Consulting, CLADD Healthcare, CLADD Investment, CLADD Medical, CLADD Supply, and VIP Medical (collectively, the "CLADD Entities") were holding and investment companies through which the defendants operated at least 29 DME subsidiary companies.

33.     Blue Ribbon Orthotics LLC ("Blue Ribbon") was a Florida corporation located at 2000 NW 95th Ave., Doral, Florida.

34.     The Brace Experts LLC ("Brace Experts") was an Ohio corporation located at 1491 Polaris Parkway, Columbus, Ohio.

35.     East Orthotics LLC ("East Orthotics") was a Florida corporation located at 2000 NW 95th Ave., Doral, Florida.

36.     Easy Life Health LLC ("Easy Life") was a Florida corporation located at 113 South Monroe Street, Tallahassee, Florida.

37.     Empower Health LLC ("Empower Health") was a Tennessee corporation located at 3102 W End Ave., Nashville, Tennessee.

38.     Excel Medical Holdings Inc. ("Excel Medical") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

39.    Exclusive Orthotics LLC ("Exclusive Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

40.    FC Health LLC ("FC Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

41.    GG Orthotics LLC ("GG Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

42.    Gold Orthotics LLC ("Gold Orthotics") was a Florida corporation located at 2000 NW 95th Ave., Doral, Florida.

43.    Healthy Medical LLC ("Healthy Medical") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

44.    Island Health LLC ("Island Health") was a Tennessee corporation located at 725 Cool Springs Blvd., Franklin, Tennessee.

45.    JB Orthotics Corp. ("JB Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

46.    Medallion Health LLC ("Medallion Health") was a Nevada corporation located at 400 S 4th St., Ste 500, Las Vegas, Nevada.

47.    Nextgen Health LLC ("Nextgen Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

48.    Niagara Health LLC ("Niagara Health") was a Nevada corporation located at 200 S Virginia St., Reno, Nevada.

49.    Northern Healthcare LLC ("Northern Healthcare") was a New Hampshire corporation located at 15 Constitution Dr., Bedford, New Hampshire.

50.     The Orthotics Shop Corp. ("Orthotics Shop") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

51.     Pacific O&P LLC ("Pacific") was an Oregon corporation located at 1050 SW 6th Avenue, Portland Oregon.

52.     PCT Health Corp. ("PCT Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

53.     Platinum Orthotics LLC ("Platinum Orthotics") was a Florida corporation located at 2000 NW 95th Ave., Doral, Florida.

54.     Premium Orthotics LLC ("Premium Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

55.     Pro Orthotics LLC ("Pro Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

56.     Silver Health LLC ("Silver Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

57.     Titan Healthcare LLC ("Titan Healthcare") was a New Hampshire corporation located at 170 Commerce Way, Portsmouth, New Hampshire.

58.     TM Health Corp. ("TM Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

59.     VIP Orthotics LLC ("VIP Orthotics") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

60.     West Healthcare LLC ("West Healthcare") was a Kansas corporation located at 9393 W 110th St., Overland Park, Kansas.

61.     WGH Health Corp. ("WGH Health") was a Florida corporation located at 1005 Northeast 125th Street, North Miami, Florida.

62.     American Care Pharmacy, LLC ("American Care") was a Florida corporation located at 2053 N University Dr., Sunrise, Florida. American Care changed its name to Aviva Care Pharmacy, LLC in or around April 2018. American Care was a pharmacy and DME provider that partnered with the CLADD Entities to provide DME.

63.     Shaoni Medical Solutions LLC ("Shaoni Medical") was a Florida corporation located at 8030 Peters Road, Plantation, Florida. Shaoni Medical was a DME provider that partnered with the CLADD Entities to provide DME.

64.     Blue Ribbon, Brace Experts, East Orthotics, Easy Life, Empower Health, Excel Medical, Exclusive Orthotics, FC Health, GG Orthotics, Gold Orthotics, Healthy Medical, Island Health, JB Orthotics, Medallion Healthcare, Nextgen Health, Niagara Health, Northern Healthcare, Orthotics Shop, Pacific, PCT Health, Platinum Orthotics, Premium Orthotics, Pro Orthotics, Silver Health, Titan Healthcare, TM Health, VIP Orthotics, West Healthcare, and WGH Health were subsidiary DME companies of the CLADD Entities that, along with American Care and Shaoni Medical (collectively, the "DME Companies"), provided DME to Medicare Advantage beneficiaries.

65.     VirtualNet.Net Digital Agency LLC ("VirtualNet") was a Florida corporation located at 4942 NW 120th Ave., Coral Springs, Florida. VirtualNet held a corporate bank account ending in 7703 at Bank 2 (the "VirtualNet Account").

66.     Defendant **MARCELO KOCHEN** was an owner and manager of the CLADD Entities and the DME Companies, the Chief Executive Officer of Excel Medical, and a resident of Miami-Dade County, Florida.

67.     Defendant **MICHAEL KOCHEN** was an owner and manager of the CLADD Entities and the DME Companies, the Chief Operating Officer of Excel Medical, and a resident of Miami-Dade County, Florida.

68.     Defendant **SANDRO HEREK** was the registered agent and owner of VirtualNet, and a resident of Broward County, Florida.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     From in or around January 2013, and continuing through in or around January 2020, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**MARCELO KOCHEN,**
**MICHAEL KOCHEN, and**
**SANDRO HEREK,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and Medicare Advantage Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

11

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

### PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes to marketing companies in exchange for the referral of Medicare Advantage beneficiaries for DME without regard to the medical necessity for the prescribed DME or whether the DME was eligible for Medicare reimbursement; (b) offering, paying, and causing the payment of kickbacks and bribes to purported telemedicine companies in exchange for doctors' orders for DME for Medicare Advantage beneficiaries, without regard to whether the items were medically necessary and eligible for reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare Advantage Plans through the DME Companies for DME that was procured through kickbacks and bribes, medically unnecessary, and ineligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare Advantage Plans; and (e) diverting the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud scheme.

### MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      **MARCELO KOCHEN**, **MICHAEL KOCHEN**, and their co-conspirators, through the operation of the CLADD Entities, obtained referrals of Medicare Advantage beneficiaries for medically unnecessary DME in exchange for illegal kickbacks and bribes paid to marketers and marketing companies, including VirtualNet.

5.      The marketers, including **SANDRO HEREK** through VirtualNet, employed call centers that used deceptive and misleading marketing tactics to recruit Medicare Advantage beneficiaries for medically unnecessary DME.

6.      **SANDRO HEREK**, through his operation of VirtualNet, paid kickbacks and bribes to offshore call centers for the referral of Medicare Advantage beneficiary information and then referred that Medicare Advantage beneficiary information to the CLADD Entities in exchange for kickbacks and bribes, knowing that the CLADD Entities would use that information to bill Medicare Advantage Plans for medically unnecessary DME.

7.      **MARCELO KOCHEN, MICHAEL KOCHEN, SANDRO HEREK**, and their co-conspirators knew that the call centers employed deceptive and misleading tactics to pressure the beneficiaries to accept the medically unnecessary products and to provide the personal information needed to bill Medicare Advantage Plans.

8.      **MARCELO KOCHEN, MICHAEL KOCHEN**, and their co-conspirators paid illegal kickbacks and bribes to purported telemedicine companies in exchange for doctors' orders for DME that was medically unnecessary and ineligible for reimbursement. In many instances, these doctors' orders were written by doctors who did not have a preexisting doctor-patient relationship with the beneficiaries, were not treating the beneficiaries, did not conduct a physical examination of the beneficiaries, and did not conduct a proper telemedicine visit.

9.     **MARCELO KOCHEN, MICHAEL KOCHEN, SANDRO HEREK**, and their co-conspirators negotiated the illegal kickback and bribe arrangements, and concealed and disguised the scheme and the existence and source of the illegal kickbacks and bribes, including by entering into sham contracts and agreements, and falsely describing them in contracts, invoices, and other documents as purported payments for legitimate services, including by falsely including provisions indicating that purported marketing services would not be used for Medicare patients, when, in fact, **MARCELO KOCHEN, MICHAEL KOCHEN, SANDRO HEREK**, and their co-conspirators specifically targeted Medicare beneficiaries with Medicare Advantage Plans.

10.     **MARCELO KOCHEN, MICHAEL KOCHEN**, and their co-conspirators caused the DME Companies to submit approximately $34,067,565 in false and fraudulent claims to Medicare Advantage Plans, via interstate wire communications, for DME that were: (a) induced through illegal kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement. Medicare Advantage Plans paid approximately $17,683,236 million as reimbursement for these claims.

11.     **MARCELO KOCHEN, MICHAEL KOCHEN, SANDRO HEREK**, and their co-conspirators used the fraud proceeds received from Medicare Advantage Plans and the kickback and bribe payments received from the DME Companies to benefit themselves and others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-10
### Health Care Fraud
### (18 U.S.C. § 1347)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2.     From in or around January 2013, and continuing through in or around January 2020, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**MARCELO KOCHEN,**
**MICHAEL KOCHEN, and**
**SANDRO HEREK,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

**PURPOSE OF THE SCHEME AND ARTIFICE**

3.     The allegations contained in paragraph 3 of the Purpose of the Conspiracy section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the purpose of the scheme and artifice.

**MANNER AND MEANS OF THE SCHEME AND ARTIFICE**

4.     The allegations contained in paragraphs 4 through 11 of the Manner and Means of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

**ACTS IN EXECUTION OF THE SCHEME AND ARTIFICE**

5.     On or about the dates specified below, in Miami-Dade and Palm Beach Counties, in the Southern District of Florida, and elsewhere, **MARCELO KOCHEN**, **MICHAEL KOCHEN**, and **SANDRO HEREK** did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, in that the

15

defendants, through the CLADD Entities, caused the submission of false and fraudulent claims to Medicare Advantage Plans, seeking reimbursement for the cost of DME, as set forth below:

| Count | Approx. Date Claim Received | Defendants | DME Company | Beneficiary | Claim Number | DME; Approx. Amount Billed |
|-------|------|------|------|------|------|------|
| 2 | March 13, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Island Health | I.S. | 8201907-20275892 | Wrist orthosis; Lumbar-sacral orthosis; $2,333 |
| 3 | March 27, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Niagara Health | E.G. | 8201908-60332054 | Knee Orthosis; Suspension sleeve; $1,648 |
| 4 | April 9, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN; SANDRO HEREK** | Medallion Health | L.S. | 8201909-90246993 | Lumbar-sacral orthosis; $1,400 |
| 5 | May 22, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Island Health | N.S. | 8201914-20219083 | Knee Orthosis; Suspension sleeve; $824 |
| 6 | June 19, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN; SANDRO HEREK** | Medallion Health | M.B. | 8201917-00214463 | Knee orthosis; Suspension sleeve; $1,648 |
| 7 | July 3, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Medallion Health | B.S. | 8201918-40206074 | Shoulder-elbow-wrist-hand orthotic; Lumbar-sacral orthosis; $2,230 |
| 8 | July 9, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Medallion Health | A.S. | 8201919-00166476 | Shoulder-elbow-wrist-hand orthotic; Lumbar-sacral orthosis; $2,230 |

| Count | Approx. Date Claim Received | Defendants | DME Company | Beneficiary | Claim Number | DME; Approx. Amount Billed |
|-------|------|------|------|------|------|------|
| 9 | August 30, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Medallion Health | D.C. | 8201924-20223331 | Shoulder-elbow-wrist-hand orthotic; Lumbar-sacral orthosis; $2,230 |
| 10 | December 12, 2019 | **MARCELO KOCHEN; MICHAEL KOCHEN** | Pacific O&P | D.H. | 8201934-60249065 | Knee Orthosis; Suspension sleeve; $1,648 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 11
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.　　The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.　　From in or around January 2017, and continuing through in or around December 2019, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**MARCELO KOCHEN,**
**MICHAEL KOCHEN, and**
**SANDRO HEREK,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.　　to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of Medicare;

17

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare and Medicare Advantage Plans;  and

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a federal health care benefit program, that is, Medicare and Medicare Advantage Plans.

## **PURPOSE OF THE CONSPIRACY**

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, paying, and causing the payment of kickbacks and bribes in exchange for the referral of Medicare Advantage beneficiaries for DME; (c) offering, paying, and causing the payment of kickbacks and bribes to telemedicine companies in exchange for doctors' orders for DME for Medicare Advantage beneficiaries; (d) submitting and causing the submission of claims to Medicare Advantage Plans through the DME Companies that were procured through the use of kickbacks and bribes; (e) concealing and causing the concealment of kickbacks and bribes; and (f) diverting the proceeds of the kickback and bribe conspiracy for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**MANNER AND MEANS**

4.     The allegations contained in paragraphs 4 through 11 of the Manner and Means of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein as a description of the Manner and Means of the conspiracy.

**OVERT ACTS**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.     On or about January 17, 2017, **MICHAEL KOCHEN** sent an email to two co-conspirators involved with marketing agreements with the CLADD Entities regarding how to upload calls from their call centers. That email also stated, "Marcelo will be sending the script and contract shortly. Please send the banking info in the reply to this email."

2.     On or about January 17, 2017, **SANDRO HEREK** sent an email to the owner of a DME provider that contracted with the CLADD Entities to provide DME to Medicare and Medicare Advantage beneficiaries stating, "About the DME leads, send this to your mom[.] We will pay these are the [sic] amounts: 225 for back brace, 100 for shoulder, 70 for elbow, 40 for ankle and wrist[.]"

3.     On or about July 7, 2017, **MICHAEL KOCHEN** sent an email to a marketer stating, "I need to run another batch of the [M]edicare leads to be returned like last time, three tabs: Medicare, M-PPO, M-HMO. So we can get the Medicare Advantage plan patients with PPO and Medicare Advantage plan with HMO policies on those separate tabs."

4.     On or about August 22, 2017, **MICHAEL KOCHEN**, on behalf of CLADD Healthcare, and **SANDRO HEREK**, on behalf of VirtualNet, entered into a "Joint Marketing

Agreement" purportedly for VirtualNet to provide marketing services to CLADD Healthcare. The Joint Marketing Agreement indicated that CLADD Healthcare was "not a Medicare or Medicaid provider and does not accept Medicare or Medicaid patients," even though the CLADD Entities, including CLADD Healthcare, through the DME Companies, billed millions of dollars to Medicare Advantage Plans.

5.     On or about October 4, 2017, **SANDRO HEREK** sent an email to **MICHAEL KOCHEN** attaching an invoice for CLADD Healthcare, LLC. The invoice was for "lead submission" charging $50 each for 62 submissions, for a total of $3,100.

6.     On or about March 21, 2018, **SANDRO HEREK** sent an email to **MARCELO KOCHEN** stating, among other things, "In January we were getting $50 per lead in the first 3 weeks, $60 in the last week[.] First week of Feb we were still at $80. Only on Feb 12th we started to get $85 per lead…I have requested to some centers to call back patients that refused to understand why they have changed their minds and also see if they are willing to receive the brace now."

7.     On or about March 27, 2018, **MARCELO KOCHEN** and **MICHAEL KOCHEN** caused $27,280 to be transferred from the CLADD Healthcare Account to **SANDRO HEREK** through the VirtualNet Account.

8.     On or about May 11, 2018, **MICHAEL KOCHEN** sent an email to **SANDRO HEREK** attaching an updated call script for **HEREK**'s call centers to use.

9.     On or about May 14, 2018, **SANDRO HEREK** sent an email to a representative from another marketing company and a representative from an Egyptian call center in response to an inquiry about a Medicare advantage and PPO campaign stating, among other things, "We have a PPO Campaign that takes almost ANY PPO insurance…The approval rate for live transfer is

95%, so it is way better because once the lead is transferred to the Triage Team, the lead is payable…If the lead in [sic] ineligible (HMO, Medicare, etc) then the lead is not payable…To be payable, the lead needs to have 2 check marks. The first on the system does it. It checks the information submitted. After that, the lead is transferred and if the leads wants to stay in the call to continue the process, that lead get the second check mark."

10.     On or about May 31, 2018, **SANDRO HEREK** sent an email to **MICHAEL KOCHEN** that contained seven recordings of recorded calls between call centers and individuals called to determine whether they were Medicare Advantage Beneficiaries.

11.     On or about February 25, 2019, **MICHAEL KOCHEN** sent an email to co-conspirators operating call centers for the CLADD Entities, including **SANDRO HEREK**, stating, "Effective Monday, February 25, 2019, all submitted leads must have a recording uploaded either through Dropbox, Box or directly in the portal. If a recording is not uploaded, the lead will NOT be payable."

12.     On or about April 9, 2019, **MARCELO KOCHEN** and **MICHAEL KOCHEN** caused $9,360 to be transferred from the CLADD Healthcare Account to **SANDRO HEREK** through the VirtualNet Account.

13.     On or about December 23, 2019, **SANDRO HEREK** sent an e-mail to **MICHAEL KOCHEN** titled "Leads." In the e-mail, **HEREK** listed 7 leads labeled "Doctor Denied," and 5 leads labeled, "ok." At the end of the e-mail, **HEREK** stated, "I will send an invoice for 5 leads, ok?"

All in violation of Title 18, United States Code, Section 371.

## COUNTS 12-14
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(A))

1.      Paragraphs 27 and 65 through 68 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates enumerated below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

### MARCELO KOCHEN and
### MICHAEL KOCHEN,

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire, as set forth below, to a person, to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicare Advantage plans:

| Count | Approx. Date of Kickback Payment | Approx. Amount of Kickback Payment | Description of Kickback Payment |
|-------|--------------------------------|-----------------------------------|-------------------------------|
| 12 | March 11, 2019 | $7,420 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |
| 13 | April 15, 2019 | $16,480 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |
| 14 | May 2, 2019 | $10,690 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## COUNTS 15-17
### Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.      Paragraphs 27 and 65 through 68 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates specified below, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

### SANDRO HEREK,

did knowingly and willfully solicit and receive any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire, as set forth below, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, that is, Medicare and Medicare Advantage plans, as set forth below:

| Count | Approx. Date of Receipt of Kickback Payment | Approx. Amount of Kickback Payment | Description of Kickback Payment |
|---|---|---|---|
| 15 | March 11, 2019 | $7,420 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |
| 16 | April 15, 2019 | $16,480 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |
| 17 | May 2, 2019 | $10,690 | Wire Transfer from the CLADD Healthcare Account to the VirtualNet Account. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1.      The allegations contained in this Indictment are hereby realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of

America of certain property in which the defendants, **MARCELO KOCHEN**, **MICHAEL KOCHEN**, and **SANDRO HEREK**, have an interest.

2.      Upon conviction of a violation, or a conspiracy to commit a violation, of Title 18, United States Code, Sections 1343, 1347, 1349, and Title 42, United States Code, Sections 1320a-7b(b)(1)(A), 1320a-7b(b)(1)(B), 1320a-7b(b)(2)(A), and 1320a-7b(b)(2)(B), as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined

at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code,

Section 982(b)(1).

A TRUE BILL

FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

WILL J. ROSENZWEIG
ASSISTANT UNITED STATES ATTORNEY

DAVID S. TURKEN
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**                           CASE NO.: _____

**v.**

MARCELO KOCHEN, et al.,                                **CERTIFICATE OF TRIAL ATTORNEY**
_____/
                  Defendants.                          **Superseding Case Information:**
                                                       New Defendant(s) (Yes or No) _____
**Court Division** (select one)                        Number of New Defendants _____
  ☒ Miami  ☐ Key West  ☐ FTP       Total number of counts _____
  ☐ FTL    ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No_____
   List language and/or dialect: _____

4. This case will take __12__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    ☐ 0 to 5 days    ☐ Petty
   II   ☐ 6 to 10 days   ☐ Minor
   III  ☒ 11 to 20 days  ☐ Misdemeanor
   IV  ☐ 21 to 60 days  ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No_____
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No_____
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No_____
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No_____
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No_____
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No_____
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No_____

By: _____

Will J. Rosenzweig
Assistant United States Attorney
Court ID No.    A5502698

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:  Marcelo Kochen**

**Case No:**

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 2–10

Health Care Fraud

Title 18, United States Code, Section 1347
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #: 11

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: 5 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 12–14

Payment of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $100,000**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:   Michael Kochen**

**Case No:**

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 2–10

Health Care Fraud

Title 18, United States Code, Section 1347
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #: 11

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: 5 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 12–14

Payment of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(2)(A)
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $100,000**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name:  Sandro Herek**

Case No: _____

Count #: 1

<u>Conspiracy to Commit Health Care Fraud</u>

<u>Title 18, United States Code, Section 1349</u>
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 4 and 6

<u>Health Care Fraud</u>

<u>Title 18, United States Code, Section 1347</u>
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #: 11

<u>Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks</u>

<u>Title 18, United States Code, Section 371</u>
**\* Max. Term of Imprisonment: 5 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $250,000**

Count #s: 15–17

<u>Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program</u>

<u>Title 42, United States Code, Section 1320a-7b(b)(1)(A)</u>
**\* Max. Term of Imprisonment: 10 years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: 3 years**
**\* Max. Fine: $100,000**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**